454

[No. 30458-2-III.   Division Three.   October 25, 2012.]

KATHRYN RYAN, *Appellant*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

456

*Jacquelyn M. High-Edward* and *Kelly A. Owen* (of *Northwest Justice Project*), for appellant.

*Robert M. McKenna, Attorney General,* and *Shannon C. Thomas, Assistant,* for respondent.

¶1 SIDDOWAY, A.C.J. — The Adult Protective Services division of the Department of Social and Health Services investigated a complaint that Kathryn Ryan had verbally

abused her mother. The investigator arrived at a substantiated finding of mental abuse. After Ms. Ryan failed to respond to notice of her right to a hearing, her name was added to a state registry of persons found to have abandoned, abused, financially exploited, or neglected a vulnerable adult. Upon learning many months later that her name was in the registry, Ms. Ryan requested a hearing, claiming she never received notice of the investigation or finding. Her attempted appeal was dismissed as untimely.

¶2 We hold that where, as here, the department knows that its residence address for an accused is incorrect, it does not satisfy the requirements of its notice regulations by mailing notice of its finding and appeal rights to that address. We reverse and remand to the board of appeals with directions to provide Ms. Ryan with a hearing.

## FACTS AND PROCEDURAL BACKGROUND

¶3 Under the abuse of vulnerable adults act, chapter 74.34 RCW, the Department of Social and Health Services is required to investigate allegations of abandonment, abuse, exploitation, and neglect of vulnerable adults. RCW 74.34.063-.068.

¶4 In October 2009, the department received a report that Ms. Ryan had mentally abused her mother. An investigation by one of the department's adult protective services investigators produced evidence that Ms. Ryan had called her mother a " '[b]itch' " and threatened her by saying " 'something bad is going to happen to you' " after an argument. Administrative Record (AR) at 69.

¶5 In speaking with Ms. Ryan's mother in late October, the investigator learned that Ms. Ryan had lived with her mother for a long time but had moved out after the event that led to the report of abuse. Ms. Ryan's mother did not know where Ms. Ryan was living. When the investigator spoke with Ms. Ryan's mother again two days later, the mother still did not know where Ms. Ryan was living and

did not know how to reach her. She did inform the investigator that Ms. Ryan was employed by Addus Healthcare Inc. Following this second conversation, the investigator called a community health case manager for the mother, who reported that she, too, did not know where Ms. Ryan was or how to reach her.

¶6 The investigator then called Addus. The investigator's notes, which were the evidence relied upon below for the department's further efforts to locate Ms. Ryan, include the following entries, suggesting that two telephone calls were made and one message was left in an effort to contact Ms. Ryan at her place of employment:

T/C [telephone call] to Addus where AP [alleged perpetrator] is employed.

Joyce reports no phone number on file to contact AP.

Joyce Bush, Assist Director, will call AP at the Ct's [client's] home where she is working and ask AP to call this writer.

Nessie from Addus called this writer to say she has a message phone number for AP [telephone number omitted].

This writer left AP a V/M [voicemail] on this number requesting a call back.

AR at 70.

¶7 In late November 2009, the department mailed a letter to inform Ms. Ryan of its substantiated finding that she had mentally abused a vulnerable adult. It addressed the letter to Ms. Ryan's mother's address, where it knew she was not living. It sent two copies of its notification letter—one by certified mail/return receipt requested and the other by regular mail. The letter stated that Ms. Ryan had 30 days to appeal the department's finding by requesting a hearing with the Office of Administrative Hearings.

¶8 The letter sent by certified mail was returned to the department in mid-December after the United States Postal Service made three unsuccessful attempts to deliver it. The envelope was marked "return to sender—unclaimed—unable to forward." AR at 85. The letter sent by

regular mail was not returned. The department made no further attempt to provide Ms. Ryan with notice of its finding.

¶9 Under department regulations, if an alleged perpetrator fails to respond to a finding of substantiated abuse, the finding becomes final. The principal consequence of finality under the regulations is that the perpetrator's name is added to a registry of final findings. The department may disclose the names of persons included in the registry to anyone, upon request. WAC 388-71-01280. Once final, inclusion in the registry is permanent. *See* WAC 388-71-01275(4) (a final finding "will remain as substantiated in the department's records unless the final finding is reversed after judicial review"). For someone like Ms. Ryan, who had worked as a caregiver for nine years, inclusion in the registry can result in the loss of employment and ineligibility for future employment that includes unsupervised access to vulnerable adults and children. *See* WAC 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 (the department will deny payment for the services of a home care agency if the services are provided by an employee who has abused a vulnerable adult), -0551 (individual provider's contract may be summarily suspended for abuse, neglect, abandonment, or exploitation of a minor child or vulnerable adult).

¶10 Ms. Ryan claims that she did not find out about the department's finding until her employer learned she was on the registry nine months after her name was added, and suspended her as a result. She requested a hearing on August 23, 2010—approximately two weeks after she claims to have learned of the finding, but long after the department mailed the notice. The department responded with a motion to dismiss her attempted appeal for lack of subject matter jurisdiction, on the basis that her request for a hearing was untimely.

¶11 In what would prove a puzzling wrinkle, the return address that Ms. Ryan used in requesting a hearing was her mother's mailing address. While it was undisputed that Ms.

Ryan was not living and could not be personally contacted at that address during the period when the department mailed notice of its finding, she testified in proceedings below that she had a key to her mother's mailbox, retained it after moving out, and regularly stopped by her mother's mailbox to pick up any mail to her that had been addressed to that location. She described the mailboxes for the mobile home park where her mother lived as located in a central location close to the road, away from the individual residences.

¶12 Ms. Ryan represented herself pro se in the administrative proceeding. In seeking relief from the department's finding, she did not contend that her mother's address was not a mailing address for her. She principally argued, by way of justification for her late request for a hearing, that it was an unreliable address, because mail to residents of the mobile home park was frequently delivered to the wrong mail boxes. She supported her contention with her own testimony and a letter that a neighbor of her mother had written to the United States Postal Service, complaining about misdelivery of mail at the mobile home park. She swore that she did not receive the mailed notice and claimed she would have timely responded if she had. The department's reply to Ms. Ryan's attempted justification was that "there is no good cause exception[,] if that's what Ms. Ryan is attempting to argue[,] for failing to adhere to the time limit." Clerk's Papers at 17.

¶13 The administrative law judge (ALJ) noted during the hearing that Ms. Ryan's written submissions pointed out that the investigator knew she was not living with her mother at the time the department mailed notice to her mother's address. The ALJ nonetheless concluded that the department had complied with regulatory notice requirements by making a reasonable, good faith effort to contact her. Finding Ms. Ryan's request for a hearing untimely, it dismissed her appeal. It did not address her evidence seeking to show good cause for her late request.

¶14 Ms. Ryan appealed the ALJ's initial order to the department's board of appeals. Continuing to represent herself pro se, she contested the dismissal in part on grounds that the department did not make a good faith effort to find her residential address. The board affirmed the ALJ's conclusion that the department demonstrated a reasonable good faith effort to locate Ms. Ryan. It also concluded that the 30-day time limit was jurisdictional and that it was powerless to entertain her evidence of excusable delay.

¶15 Ms. Ryan obtained counsel and petitioned for judicial review. The superior court affirmed. Ms. Ryan timely appealed.

## ANALYSIS

¶16 Ms. Ryan identifies a number of alternative bases on which she contends we should reverse the judgment of the board. The department partially concedes one, agreeing on appeal that an alleged perpetrator's delay in requesting a hearing can be excused by the ALJ for good cause. *See* WAC 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 (providing guidance on substantial reasons or legal justifications for failing to appear, act, or respond to an action).[1] We need not address that ground for reversal, however, because we find others to be dispositive. Given our construction of the department's regulations, the department did not present substantial evidence of compliance with the notice requirements of WAC 388-71-01210.

---

[1] The department's hearing rules include WAC 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, which provides:

"(1) Good cause is a substantial reason or legal justification for failing to appear, to act, or respond to an action. To show good cause, the ALJ must find that a party had a good reason for what they did or did not do, using the provisions of Superior Court Civil Rule 60 as a guideline.

"(2) Good cause may include, but is not limited to, the following examples.

"(a) You ignored a notice because you were in the hospital or were otherwise prevented from responding; or

"(b) You could not respond to the notice because it was written in a language that you did not understand."

*Standard of Review*

¶17 The Washington Administrative Procedure Act, chapter 34.05 RCW, governs judicial review of agency action. *Postema v. Pollution Control Hearings Bd.*, 142 Wn.2d 68, 76-77, 11 P.3d 726 (2000). We sit in the same position as the superior court and review the board's decision by applying the standards of review set out in RCW 34.05.570 directly to the agency record. *Id.* at 77. Agency action may be reversed where, among other grounds, the agency has erroneously interpreted or applied the law or its order is not supported by substantial evidence. RCW 34.05.570(3)(d), (e).

¶18 Issues of statutory construction are reviewed de novo under the error of law standard. RCW 34.05-.570(3)(d); *Life Care Ctrs. of Am., Inc. v. Dep't of Soc. & Health Servs.*, 162 Wn. App. 370, 374, 254 P.3d 919 (2011). Under this standard, we may substitute our interpretation of the law for the agency's. *R.D. Merrill Co. v. Pollution Control Hearings Bd.*, 137 Wn.2d 118, 142-43, 969 P.2d 458 (1999). Where a statute is within the agency's special expertise, the agency's interpretation is accorded great weight, provided that the statute is ambiguous. *Postema*, 142 Wn.2d at 77. However, an agency's view of the statute will not be accorded deference if it conflicts with the statute. *Id.* Ultimately, it is for the court to determine the meaning and purpose of a statute. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998).

¶19 We review an agency's factual findings for substantial evidence. RCW 34.05.570(3)(e); *Raven v. Dep't of Soc. & Health Servs.*, 167 Wn. App. 446, 461, 273 P.3d 1017, *review granted*, 175 Wn.2d 1013 (2012). Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth or correctness of the order. *Brighton v. Dep't of Transp.*, 109 Wn. App. 855, 862, 38 P.3d 344 (2001).

We do not make witness credibility determinations. *US W. Commc'ns, Inc. v. Utils. & Transp. Comm'n*, 134 Wn.2d 48, 62, 949 P.2d 1321 (1997). In this connection, we note that only Ms. Ryan and her witness testified live; the board otherwise relied on the authenticated business records of the department, including its investigator's case history notes.

*Construction of WAC 388-71-01210*

¶20 Before we review the sufficiency of the department's evidence that it complied with its notice regulation, we must first construe its regulation. Its meaning is disputed by the parties.

¶21 The regulation at issue, WAC 388-71-01210, provides:

(1) APS [the Adult Protective Services division of the department] shall notify the alleged perpetrator of a substantiated initial finding by sending a letter certified mail/return receipt requested and regular mail to the alleged perpetrator's last known place of residence. The duty of notification created by this section is subject to the ability of the department to ascertain the location of the alleged perpetrator. APS shall make a reasonable, good faith effort to determine the address of the last known place of residence of the alleged perpetrator; or

(2) APS shall have the written notice delivered or personally served upon the alleged perpetrator.

¶22 Statutory authorization for the regulation is provided by the abuse of vulnerable adults act (Act), and most particularly RCW 74.34.068, which provides in part that "[t]he department shall notify the alleged perpetrator regarding the outcome of the investigation" and "[t]he department shall adopt rules necessary to implement this section." RCW 74.34.068(1), (3).[2]

---

[2] Also cited by the department as authority in adopting the regulation were RCW 34.05.020 (Administrative Procedure Act savings provision); RCW 74.08.090 (general department rule-making authority under Title 74 RCW (public assis-

¶23 We are guided by the rules of statutory construction in construing administrative regulations. *Overlake Hosp. Ass'n v. Dep't of Health*, 170 Wn.2d 43, 51, 239 P.3d 1095 (2010). If the meaning of a rule is plain and unambiguous on its face, then we are to give effect to that plain meaning. *Id.* at 52. An ambiguity exists if there is "more than one reasonable interpretation" of the regulation. *Columbia Physical Therapy, Inc. v. Benton Franklin Orthopedic Assocs.*, 168 Wn.2d 421, 433, 228 P.3d 1260 (2010). If we find a regulation to be ambiguous, we may resort to the tools of statutory construction, legislative history, and relevant case law in order to resolve the ambiguity.

¶24 Rules should be interpreted in a manner consistent with the legislative purpose of the underlying statute. *Boise Cascade Corp. v. Huizar*, 76 Wn. App. 676, 684, 887 P.2d 417 (1994). Where possible, statutes will be construed so as to avoid any unconstitutionality. *City of Seattle v. Montana*, 129 Wn.2d 583, 590, 919 P.2d 1218 (1996). That includes, where possible, construing statutes that dictate notice requirements in a manner that satisfies due process. *See Duskin v. Carlson*, 136 Wn.2d 550, 557, 965 P.2d 611 (1998) (analyzing requirements of due process in construing notice provision); *In re Marriage of McLean*, 132 Wn.2d 301, 308, 937 P.2d 602 (1997) (same).

¶25 Our starting point in construing a regulation is its text. WAC 388-71-01210 contains two subsections. The first consists of three statements, two of which are unambiguous. Logically ordered, those two require, first, that

> APS shall make a reasonable, good faith effort to determine the address of the last known place of residence of the alleged perpetrator,

and, next, that

> APS shall notify the alleged perpetrator of a substantiated initial finding by sending a letter certified mail/return receipt

tance)); and former RCW 74.39A.050 (2009) (former quality improvement principles), *repealed by* Laws of 2012, ch. 1, § 115.

requested and regular mail to the alleged perpetrator's last known place of residence.

WAC 388-71-01210(1).

¶26 These statements are qualified or supplemented by the subsection's third statement, whose meaning the parties dispute: "The duty of notification created by this section is subject to the ability of the department to ascertain the location of the alleged perpetrator." WAC 388-71-01210(1).

¶27 Neither party suggests that this statement means that the department's duty of notification is excused if the department is unable to ascertain the alleged perpetrator's actual location. Although a possible construction, it would conflict with the statutory duty to notify provided by RCW 74.34.068—even before considering its due process implications.

¶28 Instead, the department argues that the statement is not a further directive or a condition on its options, but instead merely an observation that the department's "reasonable, good faith effort" to determine an address is inherently "subject to its ability." Br. of Resp't at 13 (emphasis omitted). This appears to have been the reading given subsection (1) by the ALJ and the board, because neither addressed the "subject to the ability to ascertain" provision of subsection (1) at all.

¶29 For her part, Ms. Ryan argues that the statement conditions the department's notification options, if not its duty. She argues that it imposes an obligation on the department to notify an alleged perpetrator of its substantiated finding in whatever manner authorized by the statute (mail, delivery, or personal service) appears best calculated to result in actual notice in a given case. Br. of Appellant at 15.

¶30 The parties' disagreement turns, in part, on the meaning they ascribe to "subject to." In the absence of a regulatory definition, we rely on the ordinary meaning of the language, which we may discern from dictionary defi-

nitions. *See State v. Kintz*, 169 Wn.2d 537, 547, 238 P.3d 470 (2010).

¶31 Dictionary definitions for "subject" can be cited to support both parties' positions. The department's construction—that the sentence merely describes an inherent risk of failure to provide notice, but not one that renders mailed notice impermissible—is supported by the definition of "subject" as "suffering a particular liability or exposure," examples being subject "to very severe draughts," and subject "to temptation." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2275 (1993). Ms. Ryan's construction—that the sentence qualifies how the department may provide notice—is supported by the definition of "subject" as "likely to be conditioned, affected, or modified in some indicated way : having a contingent relation to something and usu[ally] dependent on such relation for final form, validity, or significance." *Id.* Neither party's construction is textually unreasonable. If we eliminate the untenable meaning that inability to locate an alleged perpetrator excuses entirely the department's duty to notify, then textually, the requirement that "the duty of notification is subject to [the department's] ability to ascertain the location" has no clear meaning, even when considered in the context of the entire regulation.

¶32 Because we are construing a regulation, we reject the department's suggestion that the statement is nothing more than a comment about the inherent limitations of good faith efforts. If so, it would add nothing to the regulation. We ordinarily construe statutes so that all the language used is given effect, with no portion rendered meaningless. *G-P Gypsum Corp. v. Dep't of Revenue*, 169 Wn.2d 304, 309, 237 P.3d 256 (2010).[3] We conclude that this sentence—seemingly simple, but enigmatic in context—was

---

[3] Ms. Ryan also argues that the department's construction renders superfluous the alternative methods of notification provided by subsection (2). It is hard to imagine why the department would ever undertake delivery or personal service if authorized to rely on the administrative convenience of mail even when knowingly employing a bad address.

intended to add something. We turn to other statutory construction aids in order to determine what.

¶33 LEGISLATIVE PURPOSE OF UNDERLYING STATUTE. We first consider the underlying policy of the statute. The legislative purpose of the Act is to require that the department be prepared to receive and to act on reports of abandonment, abuse, financial exploitation, or neglect of vulnerable adults, by providing protective services. *See* RCW 74.34.005 (legislative findings). Legislative findings adopted in connection with a predecessor statute reflect an additional purpose of the legislation as being to authorize the release of findings to any agency or program with which a perpetrator is employed, contracted, or engaged as a volunteer. LAWS OF 2001, ch. 233, § 1.

¶34 The Act effectuates these purposes by requiring or authorizing the department to take action immediately upon receipt of a report or upon completion of its investigation. For example, when an initial report or investigation indicates criminal conduct, the department is required to make an immediate report to law enforcement. RCW 74.34.063(2). It is required to notify the proper licensing authority of any complaint against any individual professionally licensed, certified, or registered with the state. RCW 74.34.063(5). It may immediately provide protective services to the vulnerable adult. RCW 74.34.063(2). Upon completion of its investigation, it is authorized to provide the alleged perpetrator's name and share its finding of substantiated abuse with law enforcement; any agency or program for whom the accused is associated as an employee, volunteer, or contractor; any facility in which the incident occurred; other divisions within the department; and other investigative authorities. RCW 74.34.068; WAC 388-71-01230.

¶35 But the Act itself never conditions department authority on a "final" finding of abuse or other wrongdoing. The Act does not provide that there will be a process of appeal, that the finding will ever become perma-

nent and nonappealable, or that the department will create a registry of final findings that is available to the public. Apart from the specific reports and information-sharing authorized by the Act, it generally treats personal identification confidentially. *See* RCW 74.34.090, .095. Several provisions of the Act create and provide for an action known as a petition for an order of protection of a vulnerable adult that can lead to a judicial finding of abuse. They require that before any hearing, the respondent must be personally served, unless the court permits service by mail or publication. RCW 74.34.120(2).

¶36 We conclude that it is not a purpose of the Act that the department should administratively adjudicate, and then publish, the names of perpetrators to the public at large. We reach this conclusion even if the department acted within its rule-making authority by creating a public registry and by adopting the appeal process by which an alleged perpetrator can avoid a final finding and inclusion in the registry.[4]

¶37 Due Process. We also consider constitutional requirements of due process when the State takes action that could prevent an individual from working in his or her chosen field including by harming an individual's standing in the community—requirements that were clearly established at the time the department adopted its notice regulation. They would reasonably have been a purpose of WAC 388-71-01210 and the department's related regulations providing an alleged perpetrator with notice, appeal, and hearing rights. As previously noted, we construe rules, where possible, to avoid unconstitutionality.

¶38 WAC 388-71-01210 was filed September 21, 2004, to be effective October 22, 2004. At the time it was filed, it was clearly established that State action that imposes a stigma that alters an individual's eligibility to

---

[4] Ms. Ryan does not challenge the department's authority to create a process of appeal and finality through rule making.

exercise rights under state law or to work in a chosen field implicates protected liberty interests. *See, e.g., Ritter v. Bd. of Comm'rs*, 96 Wn.2d 503, 511, 637 P.2d 940 (1981) (interest in standing and associations in the community is protected by the Fourteenth Amendment, from state's charge (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 573, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972) (reputational harm must be coupled with impairment of rights and opportunities under state law))); *Erickson v. United States ex rel. Dep't of Health & Human Servs.*, 67 F.3d 858, 863 (9th Cir. 1995) (protectable liberty interest in serving as a participating health care provider under Medicare could be violated by state publication of erroneous disqualifying facts); *Dittman v. California*, 191 F.3d 1020, 1029 (9th Cir. 1999) (characterizing the liberty interest in pursuit of one's occupation or profession across a broad range of lawful occupations as " 'well-recognized' " (quoting *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 65 (9th Cir. 1994))).

¶39 It had long been held that before depriving a person of life, liberty, or property, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950). In adopting the regulation, the department would have known that, while due process does not require actual notice, *Dusenbery v. United States*, 534 U.S. 161, 170, 122 S. Ct. 694, 151 L. Ed. 2d 597 (2002), the government is required to consider unique information known about an intended recipient in determining whether an attempted means of providing notice is reasonably calculated to succeed. "[W]hen notice is a person's due, . . . [t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane*, 339 U.S. at 315.

¶40 In *Robinson v. Hanrahan*, 409 U.S. 38, 39-40, 93 S. Ct. 30, 34 L. Ed. 2d 47 (1972) (quoting *Mullane*, 339 U.S. at 314), for example, the United States Supreme Court held that where the State knew that the owner of a vehicle was incarcerated, notice of a vehicle forfeiture that it sent to his home address did not constitute an effort to provide notice " 'reasonably calculated' " to reach him. In adopting regulations for notice, appeal, and hearing before a finding became final, it was surely the intent of the department to adopt a manner of notification that provided due process.

¶41 In light of the purposes of the underlying statute and the department's intent in creating a process of appeal, we conclude that the most reasonable reading of the regulation—and a fair one—is one that corresponds to requirements of due process recognized at the time the regulation was filed and adopted. *Mullane* established that in order to determine the requirements of due process in a particular case, the "interest of the State" must be balanced against the "individual interest sought to be protected by the Fourteenth Amendment." 339 U.S. at 314. An alleged perpetrator has a significant interest in a damaging, irreversible, publicly available finding of wrongdoing. Given the department's extensive ability to act on initial reports and substantiated findings, the State has, at best, a limited interest in adding a final finding to its registry based on a default finding against an accused individual who likely did not know of a charge against him or her or a right to contest it.

¶42 We construe the regulation to provide that mailed notification is permissible when the department relies on a last known residence address that, in the parlance of the regulation, it has "ascertained" to be a reasonably likely residence "location of the alleged perpetrator." If it is not able to identify any last known residence address, or if it knows or has information strongly suggesting that the alleged perpetrator does not live at the residence address it has identified, then it must undertake to notify the alleged

perpetrator by delivery or personal service before proceeding to finalize its finding and add a perpetrator's name to the registry. *Accord Jones v. Flowers*, 547 U.S. 220, 230, 126 S. Ct. 1708, 164 L. Ed. 2d 415 (2006) (if the state learns that an initially defensible effort at mailed notice has failed, the Fourteenth Amendment requires the government to do more when the notice concerns such an "important and irreversible prospect" as the loss of a house); *Speelman v. Bellingham/Whatcom County Hous. Auths.*, 167 Wn. App. 624, 632, 273 P.3d 1035 (2012) (notice terminating public housing benefits mailed to the recipient's apartment did not satisfy due process since the county was aware she was incarcerated); *cf. State v. Nelson*, 158 Wn.2d 699, 705, 147 P.3d 553 (2006) (department of licensing survived "as applied" challenge to its mailed notice based on "unique circumstances," primary being the fact that it did not know that its notice to Mr. Nelson would be ineffective).

### *Did the Department Present Substantial Evidence of Compliance with Its Regulation?*

¶43 Having construed the regulation, we consider whether the department presented substantial evidence that it complied with its requirements in mailing notice to Ms. Ryan at her mother's address. A preliminary issue is whether relevant evidence for this purpose is limited to what the department knew in November 2009, when it mailed the notice, or includes information it learned much later: that Ms. Ryan continued to use her mother's address as a mailing address even after moving out. This late-discovered information would have been relevant to Ms. Ryan's defense of nonreceipt and justification for delay, but arguably was not relevant to whether the department complied with WAC 388-71-01210.

¶44 We hold that facts that were not known to the department at the time it attempted notice are not relevant in determining whether it complied with its notice

regulation. Just as an alleged perpetrator cannot challenge compliance with notice requirements by pointing to facts unknown to the department that made it unlikely notice would be received, the department may not salvage its failure to comply with its regulation on the basis that facts it later learned improved the prospect that notice was received. Whether the department satisfies its regulatory obligation is determined in light of information known when the notice is attempted. *Cf. Jones*, 547 U.S. at 231 (whether notice satisfies due process "is assessed *ex ante*, rather than *post hoc*"); *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir. 1988) ("The proper inquiry is whether the state acted reasonably in selecting means likely to inform persons affected, not whether each property owner actually received notice.").

¶45 We also note that WAC 388-71-01210(1) requires that notice be sent to the alleged perpetrator's residential address. Even if the department had known in November 2009 what it learned in and after August 2010, its information would have been of a mailing address for Ms. Ryan, not her reasonably likely residence location.

¶46 When we consider only the information known at the time the department sent notice to Ms. Ryan, it amounts to this: it knew that she did not live at the address to which it sent the notice. It knew that her mother lived there, and that Ms. Ryan was estranged from her. It knew that her mother did not know where Ms. Ryan was living. Shortly after sending its letters, and consistent with its prior knowledge, it learned that its certified letter was "unclaimed" and returned as "unable to forward."

¶47 In short, the department had no reason to believe that Ms. Ryan would receive notice mailed to the address of a residence where it knew Ms. Ryan did not live. Given the circumstances, it was required to take further steps to ascertain her actual location (such as her work address) in order to attempt to deliver or personally serve her with notice. Ms. Ryan's appeal of the department's finding should not have been dismissed as untimely.

*Attorney Fees*

¶48 Ms. Ryan asserts that she is entitled to attorney fees under RCW 4.84.350 and RAP 18.1. The statute provides for an award of fees and other expenses to a qualified party that prevails in a judicial review of an agency action unless the court finds that the agency action was substantially justified or that circumstances make an award unjust. Significant here, the statute provides that "[a] qualified party shall be considered to have prevailed if the qualified party obtained relief on a significant issue that achieves some benefit that the qualified party sought." RCW 4.84.350(1).

¶49 Ms. Ryan cannot yet be considered a "prevailing party" under RCW 4.84.350(1). A party must prevail on the merits before being considered a prevailing party. *See Parmelee v. O'Neel*, 168 Wn.2d 515, 522, 229 P.3d 723 (2010) (" 'a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff' " (quoting *Farrar v. Hobby*, 506 U.S. 103, 111-12, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992))); *Brotherton v. Jefferson County*, 160 Wn. App. 699, 705-06, 249 P.3d 666 (2011) (recognizing that a party does not "substantially prevail" under RCW 4.84.370(1) on a Land Use Petition Act, chapter 36.70C RCW, appeal if the appeal is dismissed on procedural grounds rather than being resolved on the merits).

¶50 We reverse the order dismissing Ms. Ryan's appeal and remand for the hearing on the merits that she requested.

SWEENEY and BROWN, JJ., concur.